Filed 11/9/20  In re A.T. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.T. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNANDINO COUNTY CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.T., <br><br> Defendant and Appellant. | E074867 <br><br> (Super.Ct.Nos. J271117 & J271119) <br><br> OPINION |

APPEAL from the Superior Court of San Bernardino County. Christopher B. Marshall, Judge. Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel and Dawn W. Martin, Deputy County Counsel for Plaintiff and Respondent.

1

A.T. (father) appeals the juvenile court's order terminating his parental rights over two of his sons and freeing them for adoption by their current caregivers. He argues the parental benefit exception to terminating parental rights applies to him because he consistently visited his sons throughout this dependency proceeding and because his sons are bonded to him. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i), unlabeled statutory citations refer to this code.)

We conclude the juvenile court correctly determined the exception does not apply in this case. Though the boys had regular and positive supervised visits with father, positive contacts and evidence of a bond do not, by themselves, constitute a compelling reason to deprive a dependent child of the permanency benefits of adoption; there must also be evidence that the child will suffer detriment if the parent-child relationship is severed. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1316.) In this case, the boys have been out of father's care and in the home of the same foster family for over three years. They are happy, comfortable, and thriving in their current home, and there is no evidence they would suffer detriment from the termination of father's parental rights. We therefore affirm.

## I

## FACTS

A.    *Jurisdiction and Removal*

When this dependency proceeding began, father and Angela B. (mother, who is not a party to this appeal) had been in a relationship for about five years. They have three

2

sons together, A.T., Aaron T., and Ashton T., and mother has two other sons who are the boy's half siblings—Alexander B., who is now over 18 years old, and Amon T., who was an infant at the start of this case. Though the underlying dependency proceeding involved all five boys, and though the juvenile court terminated father's parental rights over all three of his biological sons, father challenges the termination of his parental rights over A.T. and Aaron only, not Ashton. A.T. was born in 2011 and is now nine years old, and Aaron was born in 2014 and is now six years old. Ashton is father's middle son, born in 2012.

The family has a child welfare history with the San Bernardino County Children and Family Services (the department) predating this case. The social worker found several substantiated findings of general neglect going back as far as 2003, as well as more recent referrals that the department ultimately deemed unfounded. In 2016, the department opened an investigation of the family in response to referrals alleging the home was unsafe and unsanitary and the parents were using drugs and engaging in domestic violence. During the investigation, mother was arrested for a domestic violence incident that occurred in front of the children, and father was arrested for possessing drug paraphernalia. The department ultimately closed the investigation because the parents cleaned the home and participated in services, though father refused to drug test.

The current dependency proceeding arises from a referral the department received in April 2017 alleging mother was not providing stability or housing for her children. When the social worker interviewed mother's oldest son, Alexander (who, again, is not

3

father's biological child), he said father was abusive and would choke and hit him, and mother did nothing to stop him.

The department then received a referral alleging father was using crystal methamphetamine in the home in front of the children. The social worker made an announced visit to father's home and found it unsafe and unsanitary. There were animal feces on the ground and mold and mildew throughout the home. There was also an excessive amount of junk in the backyard that appeared unsafe for children and which the boys had easy access to. The paternal grandmother was at the home and appeared to be under the influence of a controlled substance. She told the social worker she was a recovering alcoholic.

Father denied using methamphetamine but refused to take a drug test. He admitted he had recently been arrested when the police responded to his house on a domestic violence call because he had a warrant for unpaid child support.

On May 22, 2017, the department obtained a detention warrant and placed all five children in the same foster home, then filed dependency petitions on their behalf. The petitions alleged the children came within section 300, subdivision (b) (failure to protect) based on father's drug use, the unsafe and unsanitary condition of the home, and domestic violence between the parents. The court detained the children and authorized drug testing for father.

When the social worker met with father the following month, the home was still unsanitary and appeared to be unsafe. There were rat feces on the floor and dirty dishes

4

piled in the sink. Father denied using any drugs. He said he had smoked marijuana every day since he was 18 but had just stopped at the beginning of the year. He also said he'd used methamphetamine only a handful of times. He believed mother's drug problems were being projected onto him.

At the contested jurisdiction and disposition hearing in August 2017, father pled no contest to the petition and the court found the substance abuse allegation against him true, adjudged all five boys dependents, removed them from parental custody, and ordered them placed in foster care. The court ordered the department to provide reunification services for both parents.

B. *The Six-Month Review Period*

Father showed promise at the very beginning of the reunification period. He participated in counseling and completed a parenting class and a domestic violence program. He also consistently attended visits. The social worker noted that the boys were bonded to him, and he interacted with them appropriately. The boys told the social worker they have a "fun time" at father's house, and A.T. would "constantly" say he was eager to go back home. Based on these positive developments, the social worker told father she believed they could transition to unsupervised visits as soon as he could demonstrate his home was safe. When she inspected the home in October 2017, however, it was still unsafe and unsanitary. She gave father another chance to clean the home, and when she reinspected about a week later, it was free of hazards.

Father's visits transitioned to unsupervised, but by February 2018, the home was once again unsafe and he was proving difficult to reach. The social worker told him that in order for his sons to be returned home, he must consistently drug test clean, stay in contact with the department, and keep his home hazard-free.

The department referred him to an outpatient program for substance abuse in June 2017, but by the time of the May 2018 six-month review hearing he still had not enrolled in the program (despite reminders from the social worker). In addition, he missed a drug test in December 2017. His next two drug tests were positive for ethanol, a result of his diabetes. The court terminated mother's services and continued father's for another six months.

C.      *The 12-Month Review Period*

During this reunification period, father remained difficult to contact and uncooperative on his case plan. He neither drug tested nor participated in an outpatient or 12-step program. He claimed it was hard for him to drug test because he had to use public transportation.

The boys were doing well in their foster parents' care. They reported feeling safe with their foster mother and said they trusted her and would go to her if they needed help. Visits with father were still going well, too, and had even transitioned to overnights. The boys also reported that they also felt safe with father.

However, at the 12-month status review hearing in October 2018, counsel for the children asked the court to order that visits revert back to supervised based on father's

failure to address his substance abuse issues or drug test. The court agreed with counsel, issued new visitation orders, and reminded father that he needed to attend a substance abuse program and drug test. Father replied that he understood, and the court continued his services for another six months.

D.      *The 18-Month Review Period*

Things continued in much the same way during this review period as they had in the previous one. Father failed to drug test and to participate in a substance abuse program, the boys were still doing well in their foster parents' care, and visits with father were still going well, too. The boys reported that they still trusted both their foster family and their father and would look to either if they needed help. Aaron and A.T. were happy and doing well in school. Ashton, on the other hand, was exhibiting some negative behaviors in class. The boys told the social worker they would like to be able to return home to father. The department recommended that the children remain in foster care with a permanent plan of returning home.

The court held a review hearing in November 2018. Counsel for the boys objected to offering father reunification services under the permanent plan, arguing that he had not participated in services up to that point and there was no indication he would suddenly start doing so. The court chastised father for failing to make progress on his substance abuse issues and terminated his reunification services. However, because the court found father's visits were going well, it selected foster care with a goal of return home as the

boys' permanent plan, and ordered that father receive up to six months of additional services under that plan.

E.     *The Permanency Planning Hearing and Termination of Parental Rights*

By May 2019, the department had changed its recommendation for the boys' permanent plan to adoption with their current caregivers and termination of father's parental rights. According to the social worker, father continued to make no efforts to address his substance abuse problem and was still "extremely difficult" to get in contact with. In a report to the court, the social worker wrote: "For the past year, [I have] stressed the importance of communication and had notified the father to check in with [me] on a weekly basis. Due to lack of communication, it has also been difficult for [me] to see if [he] has been able to maintain a home free of hazards. In addition, . . . even after [being] told multiple times about randomly testing and participating in his outpatient program, [he] has failed to participate in his services." She said father had told her that he didn't need substance abuse services.

The social worker reported that although father was still consistently visiting with the boys, the foster parents had started to take the boys to visits because he had been late on multiple occasions. And, despite being told by the court at the October 2017 status review hearing that he could have overnight visits with the boys if he tested clean, father still had not taken any drug tests.

The boys continued to do well in their foster home, and the foster parents viewed them as part of their family. The foster parents were in the process of adopting the boys'

half brother Amon, and they wanted to adopt A.T. and Aaron as well.[1] The foster parents were strong advocates for the boys and ensured their needs were being met. The social worker reported that she had seen the boys in their current home and "it is evident the[y] feel safe and bonded." The foster parents also had two biological children who treated the boys like siblings.

On May 21, 2019, the court terminated father's reunifications services and set a section 366.26 permanency planning hearing. Leading up to the hearing, the department filed a report supporting its adoption recommendation. The social worker said A.T. and Aaron were in good physical and emotional health and continued to do well in school. Aaron had just started preschool and A.T. was starting second grade. A.T.'s first grade teacher said he was a "fantastic student" who had "excelled" in the class. A.T. told the social worker he wanted to be an astronaut when he grows up, and Aaron said he wanted to be a parent.

Father was seeing the boys unsupervised once a week, with the foster parents facilitating the visits because he still had transportation problems. In June, the foster parents started to notice the boys were coming back from visits with father covered in bug bites. They told father about it, but he minimized the issue, and it continued to happen. The social worker examined the boys and found that Ashton's back was "covered" in bites and that A.T. and Aaron had bites as well. As a result, the department

---

[1] Due to concerns over Ashton's behavior, however, the foster parents wanted to get services for him and continue to be his caretakers for another year before making an adoption decision.

filed an ex parte request that father's visits be reduced to once a month and revert back to supervised. The juvenile court granted the request on August 28, 2019.

Around that same time, the department received a new referral regarding father. The referral alleged that Ashton had found a gun on father's floor during a visit and had played with it. The referral also alleged that father had bruised Ashton's upper arm by grabbing him too hard. The referral was under investigation when the department filed its report.

In mid-September, A.T. told a social worker that back when he'd had unsupervised visits at father's home, there was no running water and he'd gotten sick because father let him drink multiple cans of soda.

The department's report also contained an adoption assessment describing the foster family. The parents had been married for 30 years and had two biological sons (a 22-year-old and an 8-year-old). They had also recently adopted Amon, the boys' half brother. They were open to maintaining ongoing contact with the boys' birth family after adoption if contact was appropriate and in the boys' best interests. The boys had been living with the foster parents for over two years, were affectionate with them, comfortable in their presence, and called them "mommy and daddy." When asked how he felt if he were to stay with the foster parents and not return home, A.T. said he would be "sad but okay." The department believed that adoption was in the boys' best interests.

The permanency planning hearing took place on February 27, 2020. Father argued the parental benefit exception to terminating his parental rights applied. He testified that

he had consistently maintained positive visits with the boys. He said his bond with the boys was "extremely strong," and they told him every time they saw him that they wanted to return home.

The court found father had failed to demonstrate the exception applied. It found there was no evidence of a beneficial parental relationship or that there would be great harm to the boys in severing their relationship with him. As a result, the court terminated father's parental rights and ordered adoption as the boys' permanent plan. Father filed a timely notice of appeal.

## II

## ANALYSIS

Father argues the trial court erred by concluding the parental benefit exception did not apply. We disagree.

When a parent fails to reunify and the dependency enters the permanency planning stage, the focus shifts from keeping the family together to the needs of the child for permanency and stability. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 ["By the time of a section 366.26 hearing, the parent's interest in reunification is no longer an issue and the child's interest in a stable and permanent placement is paramount"].) As a result, the Legislature prefers adoption as the permanent plan where possible. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.) "At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable,

11

there is a strong preference for adoption over the alternative permanency plans." (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297.)

Once the juvenile court finds a child is adoptable, the parent bears the burden of proving an exception to terminating parental rights applies. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343.) The parental benefit exception at issue here applies when (i) the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" and (ii) the court finds that the parent-child relationship presents a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B)(i).) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)

Starting with *In re Autumn H.* (1994) 27 Cal.App.4th 567, our appellate courts have routinely interpreted the exception to apply to only those parent-child relationships the severance of which "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed." (*Id.* at p. 575; *In re Jasmine D.*, *supra*, 78 Cal.App.4th at pp. 1347-1348; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1161.) "The *Autumn H.* standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be detrimental to the child and outweighs the child's need for a

12

stable and permanent home that would come with adoption." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

"[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a *substantial, positive emotional attachment* such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re J.C.* (2014) 226 Cal.App.4th 503, 528-529, italics added.)

We review the juvenile court's finding on the existence of the beneficial parental relationship for substantial evidence. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.) Whether "the relationship is a 'compelling reason' for finding detriment to the child" is a "'quintessentially' discretionary decision" that we review for abuse of discretion.[2] (*Id.* at p. 1315.)

Here, it's undisputed that father maintained contact with A.T. and Aaron during the reunification period and leading up to termination of his parental rights, even if much of that contact was facilitated by the foster parents. We therefore focus our analysis on the second element of the exception, that the parent-child bond is so substantial and

---

[2] "Appellate courts are divided over the appropriate standard of review for an order concerning the applicability" of the parental bond exception. (*In re Caden C.* (2019) 34 Cal.App.5th 87, 106, review granted July 24, 2019, S255839.) Some have reviewed the decision for abuse of discretion and others for substantial evidence. Other courts have combined the two and taken a hybrid approach, as we do. (*Ibid.*) Our Supreme Court recently granted review of the issue. (*In re Caden C.* (2019) 249 Cal.Rptr.3d 520, 444 P.3d 665.)

positive that freeing the boys for adoption would be detrimental to their well-being. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Father argues he has demonstrated that A.T. and Aaron would suffer detriment if adopted because they share a very strong bond with him. He points out that, at the beginning of the reunification period, even the department described his relationship with his sons as "extremely bonded." While there is certainly evidence in the record that A.T. and Aaron enjoyed their visits with father and expressed a desire to return home, the problem for father (and for many parents at this stage in a dependency), is that the record contains just as much—if not more—evidence that the boys loved their caregivers and were happy and comfortable in their home. The boys called the foster parents "mommy and daddy," and their half brother Amon had recently been adopted by them. Though the boys may have been sad at the end of their visits with father, they exhibited no lasting negative impacts from not being able to live with him. In fact, by all indications, they were thriving in the foster parents' care, excelling both academically and emotionally. And though the boys may have been too young to express their feelings about adoption, A.T. told the social worker he would be "sad but okay" if he couldn't return home to father.

Unfortunately for father, a shared affection between a parent and child is simply not enough to warrant foregoing an adoption in a safe and stable home once reunification efforts have failed. And in this case, it bears noting that reunification failed emphatically, as father made absolutely no effort to treat the problem that led to removal—despite

being told numerous times for almost two years that the only thing standing between him and his sons was substance abuse treatment and clean drug tests.

It also bears mentioning that the evidence regarding father's visits was not unanimously positive. While there were no issues during supervised visits, there were issues when visits were unsupervised. A.T. reported not having running water and getting sick off too much soda. The foster parents reported that the boys would come back from visits with numerous bug bites. And the department received a report that Ashton had found a gun at father's house and father had injured Ashton's arm. But even if we overlook these issues, our courts have emphasized time and again that positive visits, on their own, are not enough to outweigh the permanency benefits of adoption, especially where the child has developed a bond with the current caregivers, as these boys have. "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) While the evidence of a strong bond that father relies on may support an inference that he was an affectionate figure in the boys' lives, it falls short of demonstrating he occupied a parental role.

In short, there is no evidence in this record to support a conclusion that the boys would be greatly harmed if freed for adoption. And as a result, it was entirely reasonable for the juvenile court to conclude their relationship with father did not outweigh the benefits of adoption. At this point the boys have been out of father's care and in the stable

15

care of the foster parents for over three years, which is half of A.T.'s young life. They deserve the permanency benefits adoption will provide.

## III

## DISPOSITION

We affirm the order terminating father's parental rights.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

CODRINGTON
Acting P. J.

FIELDS
J.